# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

Civil Action No. 16-2915

MICHAEL CORNELL and
LAUREN RODRIGUEZ,

      Plaintiffs,

v.

DENVER C.A.R.E.S., a behavioral health facility operated by Denver Health Medical
Center/Denver Health and Hospital Authority,
DENVER POLICE DEPARTMENT,
ROBERT C. WHITE, Denver Police Chief,
JOHN DOES #1 AND #2, officers of the Denver Police Department,
BILL BURMAN, M.D., Chief Executive Officer, Denver Health Medical Center,
NICOLE MCLEAN,
FIRST NAME UNK. PORTILLO,
RENE MISELA,
AVA WALSTON,

      Defendants.

---

## COMPLAINT AND JURY DEMAND

---

Plaintiffs, Michael Cornell and Lauren Rodriguez, by and through counsel, PRISONERS'

JUSTICE LEAGUE OF COLORADO LLC, for their Complaint and Jury Demand against Defendants

Denver C.A.R.E.S.; Denver Police Department; Robert C. White, Denver Police Chief; John Does

#1 and #2; Bill Burman, M.D., Chief Executive Officer, Denver Health Medical Center; Nicole

McLean; First Name Unk. Portillo; Rene Misela; and Ava Walston, state and allege as follows:

**INTRODUCTION**

After attending the November 29, 2015, Denver Broncos versus New England Patriots game at Sports Authority Field at Mile High Stadium ("Mile High"), long-time Broncos fans Michael Cornell and Lauren Rodriguez were unlawfully incarcerated and detained at the Denver C.A.R.E.S. ("Denver CARES") detoxification facility. Mr. Cornell and Ms. Rodriguez's detention and incarceration was the result of the Denver Police Department ("DPD") and Denver CARES' collusive policy and practice of forcibly detaining intoxicated individuals under the guise of providing consensual medical care to generate revenue for the City and County of Denver and the Denver Health and Hospital Authority ("DHHA").

Though there is a statute authorizing the emergency commitment of intoxicated or incapacitated individuals who clearly pose a threat to their own or others' safety, neither DPD nor Denver CARES invoked or followed the mandates of that statute when they took custody of, detained, and incarcerated Mr. Cornell and Ms. Rodriguez for the pretextual purpose of treating their alcohol intoxication. When Mr. Cornell and Ms. Rodriguez requested to leave the Denver CARES facility, staff members threatened to arrest them. In Mr. Cornell's case, staff met his demands to leave the facility with placement in solitary confinement, which Denver CARES euphemistically refers to as the "quiet room."

Mr. Cornell and Ms. Rodriguez bring this action to vindicate their constitutional, statutory, and common law rights against unlawful intrusion of their person and interference with their bodily integrity. Mr. Cornell and Ms. Rodriguez also seek to end DPD and Denver CARES' collusive practice of extorting money from law abiding citizens who do not consent to Denver CARES' "treatment" in order to fund the Denver CARES program. As set forth herein, they assert claims

arising under the Fourth and Fourteenth Amendments to the U.S. Constitution; Article II, Section 25, of the Colorado Constitution; and common law tort of false imprisonment. Mr. Cornell and Ms. Rodriguez seek nominal, compensatory, and punitive damages as well as prospective relief designed to stop DPD and Denver CARES' abuse and intrusion upon Denverites' bodily integrity and personal security.

## JURISDICTION AND VENUE

1. The court possesses subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331, 1343, and 1367.

2. Venue is proper in the District of Colorado pursuant to 28 U.S.C. § 1391(b)(2) because the events giving rise to Plaintiffs' claims occurred within the District of Colorado.

3. The court has personal jurisdiction over each of the Defendants under Fed. R. Civ. P. 4(k)(1).

## PARTIES

4. Plaintiff Michael Cornell is a resident of the City of Lakewood, Jefferson County, Colorado.

5. Plaintiff Lauren Rodriguez is a resident of the City of Lakewood, Jefferson County, Colorado.

6. Defendant Denver CARES is a behavioral health facility operated by DHHA. The facility operated by Denver CARES is located at 1155 Cherokee Street. Denver CARES' purported mission is to provide drug and alcohol detoxification and rehabilitation services. Denver CARES is a subsidiary of DHHA, a political subdivision of the State of Colorado.

7. Defendant DPD is a law enforcement agency. DPD is a political subdivision of the State of Colorado.

8. Defendant Robert C. White is the DPD Chief. In that role, Defendant White is responsible, among other things, for enforcing DPD's policies, practices, and customs. Defendant White is sued in his official capacity.

9. Defendants John Does #1 and #2 are police officers employed by DPD who are responsible for taking Mr. Cornell and Ms. Rodriguez into custody and transporting them to the Denver CARES facility on the evening of November 29, 2015. The Doe Defendants are sued in their individual capacities.

10. Defendant Bill Burman, M.D., is the Chief Executive Officer of the Denver Health and Hospital Authority. In that role, Defendant Burman is responsible, among other things, for enforcing DHHA and Denver CARES' policies, practices, and customs. Defendant Burman is sued in his official capacity.

11. Defendant Nicole McLean is an employee of Denver CARES. Defendant McLean is sued in her individual capacity.

12. Defendant First Name Unk. Portillo is an employee of Denver CARES. Defendant Portillo is sued in her individual capacity.

13. Defendant Rene Misela is an employee of Denver CARES. Defendant Misela is sued in her individual capacity.

14. Defendant Ava Walston is an employee of Denver CARES. Defendant Walston is sued in her individual capacity.

**ALLEGATIONS REGARDING MR. CORNELL AND MS. RODRIGUEZ'S CUSTODY AND DETENTION AT THE DENVER CARES FACILITY**

## I. *DPD Detention and Custody.*

15. On November 29, 2015, Mr. Cornell and Ms. Rodriguez, Denver Broncos season ticket holders, attended the Denver Broncos versus New England Patriots game at Mile High.

16. Both Mr. Cornell and Ms. Rodriguez were of legal drinking age.

17. While at the game, Mr. Cornell and Ms. Rodriguez consumed a number of alcoholic beverages that they lawfully purchased from vendors at Mile High.

18. Just before the game was over, Mr. Cornell and Ms. Rodriguez exited the stadium and began to walk toward Ms. Rodriguez's parents' car, where they intended to wait for Ms. Rodriguez's parents to drive them home.

19. As they were walking out of the stadium, the Doe Defendants approached Mr. Cornell and Ms. Rodriguez and began interrogating Mr. Cornell about his level of intoxication. Mr. Cornell admitted to being intoxicated but emphasized that he was not driving and had lawfully consumed alcohol inside the stadium.

20. In the State of Colorado, it is not unlawful to be intoxicated, even in public.

21. While the Doe Defendants were interrogating Mr. Cornell about his intoxication, they placed him in handcuffs and slammed his head against the side of their patrol car.

22. During the course of the Doe Defendants' interrogation of Mr. Cornell, Ms. Rodriguez's parents exited the stadium and reached the place where the interrogation happened, which was near their car.

23. On seeing her long-time boyfriend assaulted by the Doe Defendants, Ms. Rodriguez became upset and afraid and got into her parents' car and locked the doors.

24. One of the Doe Defendants came over to Ms. Rodriguez's parents' car and banged on the windows, demanding that Ms. Rodriguez exit the vehicle. The officer threatened to break a window and forcibly remove Ms. Rodriguez from the car if she did not comply.

25. Fearing for her physical safety, Ms. Rodriguez exited the car.

26. The Doe Defendants told Mr. Cornell and Ms. Rodriguez that they were not under arrest, nor were they suspected of committing any crime, but that they would be taken to "detox" for their intoxication. The officers threatened to arrest Mr. Cornell and Ms. Rodriguez if they did not comply with their efforts to detain and transport them to an alcohol detoxification facility.

27. Out of fear, Mr. Cornell and Ms. Rodriguez submitted to the DPD officers, who transported the two to the Denver CARES facility located at 1155 Cherokee Street, Denver, Colorado.

28. The DPD officers placed Mr. Cornell and Ms. Rodriguez into the custody of Denver CARES, again threatening arrest if they resisted placement at the facility.

## II. Denver CARES Detention and Custody – Mr. Cornell.

29. On Mr. Cornell's admission to Denver CARES, staff completed a "Service Plan." The Service Plan identified Mr. Cornell's "Problem 1" as "[a]lcohol or drug intoxication or experiencing withdrawal from alcohol and/or drug use." According to the form, "Goal 1" was "[d]etoxification and stabilization of vital signs." Mr. Cornell's blood alcohol level ("BAL") was identified as .124 as of 11:15 p.m. on November 29, 2016.

30. The completed Service Plan reflects that Mr. Cornell's skin was normal, warm, and dry; that Mr. Cornell was able to walk alone; that Mr. Cornell's behavior/mood was calm and

cooperative; that Mr. Cornell appeared clean and neat; and that Mr. Cornell was oriented to person, place, and time.

31. The Service Plan identified a second "problem," that Mr. Cornell had a swollen forehead. The swelling was the consequence of one of the Doe Defendants having slammed his head into the side of the patrol car, as described above.

32. The Service Plan is signed by Defendants Portillo—as admitting RN—and Defendant Misela—as admitting counselor.

33. A second page of the Service Plan is signed by Defendant McLean as counselor. In the space designated for Mr. Cornell's signature, Ms. McLean wrote "Refused," and dated the form November 30, 2016.

34. The second page of the Service Plan describes Mr. Cornell's "diagnosis" as "intoxication/mild."

35. After completion of the first page of the Service Plan, Denver CARES staff placed Mr. Cornell in a dormitory style room for his "safe and humane detox." The dormitory was equipped with cots and Gatorade.

36. Mr. Cornell was confined to the dormitory from approximately 11:15 p.m. to 3:40 a.m. At no time did he receive any medical treatment.

37. In fact, Mr. Cornell asked multiple times for his head injury to be treated, and Denver CARES staff repeatedly refused to provide him any meaningful medical treatment.

38. At approximately 3:40 a.m. on November 30, 2015, Denver CARES staff placed Mr. Cornell in solitary confinement, a/k/a the "quiet room," for "demanding medical attention," being "verbally abusive," and "demanding to leave" the Denver CARES facility.

7

39.     The Denver CARES "quiet room" into which Mr. Cornell was placed is a small concrete and metal cell, mimicking a prison or jail solitary confinement cell, with nothing inside it but a concrete bench and a hole in the floor to be used for bodily functions. The room is barricaded by a solid steel door with a small plexiglass window and a tray slot.

40.     At the time that Denver CARES staff placed Mr. Cornell in solitary confinement, Defendant Misela completed an "Application for Emergency Commitment of Intoxicated or Incapacitated Person Under Section 27-81-111, C.R.S." ("Emergency Commitment Application"). This was the first time that anyone completed or signed such an application relating to Mr. Cornell.

41.     On the Emergency Commitment Application, the space marked "Name of intoxicated or incapacitated person" is left blank.

42.     As grounds for the emergency commitment, two boxes are checked: one for intoxication and one for incapacitation, both stating that Mr. Cornell was clearly a danger to himself or others.

43.     Mr. Cornell's BAL is noted to be .124 at 3:40 a.m. on November 30, 2015, which is not accurate.

44.     Mr. Cornell was not legally intoxicated at 3:40 a.m. on November 30, 2015.

45.     In the section requesting a description of the "need for emergency commitment and the clearly dangerous behavior, personal observations[,] and specific statements of others," Defendant Misela wrote:

> Client is demanding medical attention after already being seen by the medical staff. Client is also verbally abusive. Client is also demanding to leave.

46. An administrator, whose name is illegible on the Emergency Commitment Application, accepted "the above named person for emergency treatment until the grounds for commitment no longer exist . . . ."

47. The same administrator purported to discontinue the emergency commitment at 5:18 a.m. on November 30, 2015, at which time Mr. Cornell was ostensibly released from Denver CARES.

48. The Emergency Commitment Application form contains a "Notice to Person Admitted for Emergency Commitment" that advises of, among other things, the right to challenge the commitment via a writ of habeas corpus, the right to be represented by counsel in relation to the commitment, and the right to have counsel appointed by the court.

49. Neither Defendant Misela nor any other Denver CARES staff member provided Mr. Cornell with a copy of that notice, and the space for Mr. Cornell's signature underneath the notice is blank on the Emergency Commitment Application form.

50. In a separate Denver CARES "Quiet Room Record," Mr. Cornell is identified as being "verbally loud/abusive/obscene."

51. The Quiet Room Record indicates that Mr. Cornell did not go to solitary confinement voluntarily, but instead with "staff support."

52. The person who completed the Quiet Room Record—on information and belief, Defendant Misela—checked a box saying that Mr. Cornell was "given copy of rights" because there was a "copy posted in intake."

53. Mr. Cornell was not in fact notified of his rights under § 27-81-111, C.R.S. either verbally or in writing.

54. The Quiet Room Record is signed by Defendants Portillo, Misela, and a charge nurse whose name is not legible.

### III. Denver CARES Detention and Custody – Ms. Rodriguez.

55. Staff also completed a "Service Plan" for Ms. Rodriguez on her arrival to Denver CARES.

56. Like Mr. Cornell's Service Plan, Ms. Rodriguez's Service Plan reflects that she had normal, warm, and dry skin; that she was able to walk alone; that she was calm and cooperative; that she appeared clean, and was oriented to person, place, and time.

57. Ms. Rodriguez's Service Plan also described her "Problem 1" as "alcohol or drug intoxication or experiencing withdrawal from alcohol and/or drug use." "Goal 1" was to "provide safe [and] humane detox."

58. Ms. Rodriguez's "diagnosis," as indicated on the Service Plan, is "abuse/moderate."

59. The first page of Ms. Rodriguez's Service Plan is signed by Defendants Portillo and Misela, and the second page is signed by Defendant Walston, Ms. Rodriguez's "assigned counselor."

60. No application for emergency commitment was submitted or approved for Ms. Rodriguez.

61. On November 30, 2015, Defendant Walston completed a Drug/Alcohol Coordinated Data System ("DACODS") questionnaire about Ms. Rodriguez.

62. The DACODS questionnaire specifically notes that Ms. Rodriguez was not admitted to Denver CARES pursuant to any commitment or holding procedure, including emergency commitment.

63. The DACODS also notes that Ms. Rodriguez is employed full time and earns approximately $2,500 monthly.

64. After the intake process was complete, Ms. Rodriguez was placed in a female dormitory like the one that Mr. Cornell was placed in before being sent to solitary confinement.

65. Ms. Rodriguez was detained in the female dormitory despite requests to leave until approximately 9:10 a.m. on November 30, 2015.

### IV. Denver CARES Discharge and Fee.

66. When they were finally permitted to "discharge" from Denver CARES, both Mr. Cornell and Ms. Rodriguez were forced to go through an exit interview process during which Denver CARES continued to detain them without permission to leave, even though they had technically been released from the facility.

67. During the exit interview, Denver CARES staff asked a number of intrusive questions about each of their personal lives and behaviors and endeavored to force "counseling" regarding a number of personal matters like sexually transmitted diseases and lifestyle choices. Neither Mr. Cornell nor Ms. Rodriguez consented to such counseling.

68. Finally, before being permitted to leave Denver CARES, both Mr. Cornell and Ms. Rodriguez were forced to pay $325.00 each for their "treatment."

69. Neither Mr. Cornell nor Ms. Rodriguez was permitted to provide health insurance information so that Denver CARES could submit the claim for payment by their health insurers.

70. Both Mr. Cornell and Ms. Rodriguez were threatened with increased rates if they did not pay the $325.00 before leaving the Denver CARES facility.

71. Both Mr. Cornell and Ms. Rodriguez were forced to pay the $325.00 fee notwithstanding that neither ever consented to receive medical treatment from or to be admitted to the Denver CARES facility.

**ALLEGATIONS REGARDING DPD AND DENVER CARES' POLICY AND CUSTOM OF UNLAWFULLY DETAINING INTOXICATED INDIVIDUALS FOR REVENUE**

72. DPD and Denver CARES took custody of and detained Mr. Cornell and Ms. Rodriguez as part of their policy and custom of unlawfully committing intoxicated individuals who do not pose a threat to themselves or others to the Denver CARES facility.

73. The Denver CARES facility is a community detoxification facility that ostensibly provides valuable drug and alcohol treatment services to low income Coloradans who truly struggle with addiction and wish to live sober lifestyles.

74. Denver CARES' payment model consists of a sliding scale that permits indigent clients to obtain services at no or low cost. Accordingly, for those individuals, Denver CARES' services require significant government funding.

75. Denver CARES serves a significant number of homeless individuals who are totally unable to pay.

76. On information and belief, in order to offset the cost of providing detoxification and drug and alcohol treatment services to indigent clients, including homeless individuals, DPD and Denver CARES engage in a policy and custom of rounding up intoxicated individuals who they believe have the means to pay for Denver CARES' services and committing them to the

12

Denver CARES facility without their consent and in violation of the Colorado emergency commitment statute.

77.     As part of this policy and custom, DPD patrols in areas where there are likely to be masses of people who have become intoxicated legally and by purchasing alcoholic beverages from Denver businesses, like Denver Broncos games and the Lower Downtown area on weekend nights. DPD regularly takes custody of and transports these intoxicated individuals to Denver CARES without having probable cause to believe that they are a danger to themselves or others.

78.     Even though the Colorado emergency commitment statute expressly permits DPD to provide or obtain safe transportation home for individuals who are intoxicated but not dangerous, DPD officers elect to take these individuals to Denver CARES as a means of generating revenue for the facility.

79.     In executing this policy and custom of rounding up, *en masse,* intoxicated but not dangerous individuals who are likely to be able to pay the Denver CARES fee, DPD and Denver CARES do not invoke the Colorado emergency commitment statute or follow its procedural mandates, but rather detain them at Denver CARES under the guise of consensual medical treatment.

80.     Denver CARES treatment under these circumstances is anything but consensual. First, if an individual is truly so intoxicated that he cannot be at home or in the community, he cannot lawfully consent to medical treatment. Second, Denver CARES commitments are made under threat of arrest for non-consent, thereby rendering consent to be made under duress.

81. Further, on commitment to Denver CARES, no meaningful medical treatment is actually provided. Rather, Denver CARES warehouses committed individuals in dormitories, providing minimal if any monitoring, until detainees' "estimated sober time" ("EST").

82. Denver CARES staff calculate a detained individual's EST by assessing his BAL on intake and using a chart or formula to determine when the alcohol *should* be metabolized based on the individual's weight. The EST reflects the estimated time that a breathalyzer test would result in an individual's "blowing triple zeros," *i.e.*, the time that a breathalyzer test would result in a BAL read of .000.

83. Even if an individual were properly detained pursuant to Colorado's emergency commitment statute, this method of determining when an individual should be released from the Denver CARES facility disregards the statute's definition of intoxication, which requires not simply that an individual have consumed any alcohol or have any alcohol in his system, but also that the person's "mental or physical functioning [be] temporarily but substantially impaired as a result of the presence of alcohol in his or her body."

84. Nor does this method of determining when a person should be released from Denver CARES take into account a person's ongoing level of dangerousness even though the emergency commitment statute requires release as soon as a person no longer poses a threat to himself or others.

85. Mr. Cornell was further subject to Denver CARES' policy and custom of placing detained individuals in solitary confinement for essentially no reason and with no process whatsoever.

86. Solitary confinement is a harsh and degrading method of detention that has been regularly denounced by the United Nations Special Rapporteur on torture and, in certain instances, violates the Convention Against Torture. Needless to say, using it is a gravely serious matter.

87. The use of solitary confinement on unlawfully committed or detained citizens by non-law enforcement officials is unprecedented. That Denver CARES even has solitary confinement cells evidences that the facility is operating as a *de facto* jail that simply circumvents all constitutional requirements that attach upon lawful arrest and detention.

88. Though Mr. Cornell was only held in solitary confinement for less than two hours, he was nevertheless traumatized by being held in a concrete and steel box for asking for medical care from an alleged medical provider and for demanding to leave a place that he was being illegally confined to.

89. Denver CARES' use of solitary confinement on individuals illegally detained at the facility is routine and often lasts for many hours.

90. Denver CARES' practice of forcing individuals to pay $325.00 on release from the facility under threat of increased fees if payment is deferred, and without providing an opportunity to bill the individual's health insurer, is also customary in any instance where the person is not indigent and/or homeless.

**CLAIM ONE – FOURTH AMENDMENT TO THE**
**U.S. CONSTITUTION, SEIZURE OF PERSON**
**(Against All Defendants)**

91. Mr. Cornell and Ms. Rodriguez hereby incorporate paragraphs 1-90, above.

92. Defendants Does #1 and #2, McLean, Portillo, Misela, and Walston (the "Individual Capacity Defendants") personally participated in seizing Mr. Cornell and Ms. Rodriguez's persons and causing their detention at the Denver CARES facility.

93. None of the Individual Capacity Defendants had probable cause to believe that Mr. Cornell or Ms. Rodriguez were both intoxicated and clearly a danger to themselves or others.

94. By causing Mr. Cornell and Ms. Rodriguez's seizure without probable cause to believe either was intoxicated and clearly a danger to themselves or others, each of the Individual Capacity Defendants violated Mr. Cornell and Ms. Rodriguez's right against unlawful seizure in violation of the Fourth Amendment to the U.S. Constitution.

95. Each of the Individual Capacity Defendants is liable to Mr. Cornell and Ms. Rodriguez for nominal, compensatory, and punitive damages in amounts to be determined by the jury.

96. The Individual Capacity Defendants' unlawful seizure of Mr. Cornell and Ms. Rodriguez was part of DPD and Denver CARES' policy and custom of taking custody of and detaining intoxicated individuals without probable cause to believe that they are clearly a threat to themselves or others.

97. DPD and Denver CARES are liable to Mr. Cornell and Ms. Rodriguez for nominal, compensatory, and punitive damages in amounts to be determined by the jury, as well as prospective relief designed to protect Mr. Cornell and Ms. Rodriguez from future seizures of their person without probable cause to believe they are intoxicated and clearly dangerous to themselves or others.

**CLAIM TWO – FOURTEENTH AMENDMENT TO THE**
**U.S. CONSTITUTION AND ARTICLE II, SECTION 25 OF THE**
**COLORADO CONSTITUTION, PROCEDURAL DUE PROCESS**
**(Against All Defendants)**

98.     Mr. Cornell and Ms. Rodriguez hereby incorporate paragraphs 1-97, above.

99.     Mr. Cornell and Ms. Rodriguez's detention at the Denver CARES facility deprived them of a constitutionally protected liberty interest.

100.    Mr. Cornell and Ms. Rodriguez's detention at the Denver CARES facility deprived them of a constitutionally protected property interest, namely $325.00 each. Moreover, Mr. Cornell and Ms. Rodriguez's Denver Broncos season ticket holder privileges were suspended as a consequence of DPD taking them into custody at Mile High. In order to regain their season ticket holder status, Mr. Cornell and Ms. Rodriguez are required to pay a reinstatement fee and take a paid class.

101.    Each of the Individual Capacity Defendants caused Mr. Cornell and Ms. Rodriguez's detention at the Denver CARES facility.

102.    Mr. Cornell and Ms. Rodriguez were deprived of adequate procedural protections prior to their confinement at the Denver CARES facility, including but not limited to clear and convincing evidence that they were intoxicated and clearly a danger to themselves or others and notification of their rights under the Colorado emergency commitment statute, set forth at § 27-81-111, C.R.S., including the right to challenge their detention and the assistance of counsel in doing so.

103.    By depriving Mr. Cornell and Ms. Rodriguez of adequate procedural protections prior to their placement at Denver CARES, each of the Individual Capacity Defendants violated

Mr. Cornell and Ms. Rodriguez's right to procedural due process protected by the Procedural Due Process Clause of the Fourteenth Amendment to the U.S. Constitution.

104. Each of the Individual Capacity Defendants is liable to Mr. Cornell and Ms. Rodriguez for nominal, compensatory, and punitive damages in amounts to be determined by the jury.

105. The Individual Capacity Defendants' violation of Mr. Cornell and Ms. Rodriguez's right to procedural due process was part of DPD and Denver CARES' policy and custom of taking custody of and detaining intoxicated individuals without evidence that they are clearly a threat to themselves or others and advisement of rights.

106. DPD and Denver CARES are liable to Mr. Cornell and Ms. Rodriguez for nominal, compensatory, and punitive damages in amounts to be determined by the jury, as well as prospective relief designed to protect Mr. Cornell and Ms. Rodriguez from future denials of their right to procedural due process should they ever be subject to DPD and Denver CARES' policy and custom of detaining intoxicated individuals again.

### CLAIM THREE – FOURTEENTH AMENDMENT TO THE U.S. CONSTITUTION, SUBSTANTIVE DUE PROCESS
### (Against All Defendants)

107. Mr. Cornell and Ms. Rodriguez hereby incorporate paragraphs 1-106, above.

108. The Individual Capacity Defendants were aware, at the time that they caused Mr. Cornell and Ms. Rodriguez's custody and detention at the Denver CARES facility, that they were not clearly intoxicated and dangerous to themselves or others, and therefore that no legal grounds to force their detention at Denver CARES existed.

109. The Individual Capacity Defendants were aware, at the time they caused Mr. Cornell and Ms. Rodriguez's custody and detention at the Denver CARES facility, that neither Mr. Cornell nor Ms. Rodriguez consented to receive any medical or mental health "treatment" at the facility.

110. The Individual Capacity Defendants intentionally mischaracterized Mr. Cornell and Ms. Rodriguez's custody and detention at the Denver CARES facility to cause Mr. Cornell and Ms. Rodriguez to believe that they were lawfully prohibited from leaving the Denver CARES facility at any time.

111. The Individual Capacity Defendants threatened Mr. Cornell and Ms. Rodriguez with arrest if they attempted to leave the Denver CARES facility knowing that no grounds for arrest actually existed.

112. The Individual Capacity Defendants' conduct in causing Mr. Cornell and Ms. Rodriguez's custody and detention at the Denver CARES facility was motivated by a desire to cause Mr. Cornell and Ms. Rodriguez to pay money to Denver CARES.

113. The Individual Capacity Defendants' conduct in causing Mr. Cornell and Ms. Rodriguez's custody and detention at the Denver CARES facility shocks the conscience, in violation of Mr. Cornell and Ms. Rodriguez's rights protected by the Substantive Due Process Clause of the Fourteenth Amendment to the U.S. Constitution.

114. Each of the Individual Capacity Defendants is liable to Mr. Cornell and Ms. Rodriguez for nominal, compensatory, and punitive damages in amounts to be determined by the jury.

115. The Individual Capacity Defendants' violation of Mr. Cornell and Ms. Rodriguez's right to procedural due process was part of DPD and Denver CARES' policy and custom of taking custody of and detaining intoxicated individuals without evidence that they are clearly a threat to themselves or others and advisement of rights.

116. DPD and Denver CARES are liable to Mr. Cornell and Ms. Rodriguez for nominal, compensatory, and punitive damages in amounts to be determined by the jury, as well as prospective relief designed to protect Mr. Cornell and Ms. Rodriguez from future denials of their right to substantive due process should they ever be subject to DPD and Denver CARES' policy and custom of detaining intoxicated individuals again.

### CLAIM FOUR – COMMON LAW FALSE IMPRISONMENT
### (Against All Defendants)

117. Mr. Cornell and Ms. Rodriguez hereby incorporate paragraphs 1-116, above.

118. In causing Mr. Cornell and Ms. Rodriguez's custody and detention at the Denver CARES facility, including Mr. Cornell's solitary confinement, Defendants intended to confine Mr. Cornell and Ms. Rodriguez to the facility and to restrict their movement both within and to that facility.

119. Mr. Cornell and Ms. Rodriguez did not consent to the restraints on their freedom imposed by Defendants.

120. Defendants' conduct resulted in Mr. Cornell and Ms. Rodriguez actually being restrained and confined to and within the Denver CARES facility.

121. Mr. Cornell and Ms. Rodriguez were conscious of their restriction and confinement to and within the Denver CARES facility.

122.    As a consequence of Defendants' conduct, Mr. Cornell and Ms. Rodriguez are entitled to nominal, compensatory, and punitive damages in amounts to be proved at trial.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs Michael Cornell and Lauren Rodriguez pray for judgment against Defendants as follows:

a. Nominal, compensatory, and punitive damages in amounts to be determined by the jury;

b. Reasonable attorneys' fees and expenses, expert witness fees, and the costs of suit herein;

c. Interest, statutory and moratory, allowed by law;

d. An order prohibiting DPD and Denver CARES from causing Mr. Cornell and Ms. Rodriguez's custody and detention at Denver CARES in the future, without probable cause to believe that they are clearly intoxicated and a danger to themselves or others;

e. An order prohibiting DPD and Denver CARES from causing Mr. Cornell and Ms. Rodriguez's custody and detention at Denver CARES in the future without adequate procedural and substantive due process protections; and

f. Such other and further relief as the court deems just and proper.

**JURY TRIAL DEMANDED**

Mr. Cornell and Ms. Rodriguez demand a trial by jury as to all issues so triable.

Respectfully submitted this 29th day of November, 2016.

**PRISONERS' JUSTICE LEAGUE OF COLORADO LLC**

*s/ Elisabeth L. Owen*
Elisabeth L. Owen
150 E. 10th Avenue
Denver, CO 80203
T: 720.287.5836
E: lisi@pjlcolorado.com